AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original ☐ Duplicate Ori

FILED
CLERK, U.S. DISTRICT COURT
6/21/2021
CENTRAL DISTRICT OF CALIFORNIA
BY _Valerian Juarez_ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT

6/21/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ___JB___ DEPUTY

United States of America

v.

JACQUIS CELESTINE,

Defendant(s)

Case No.  2:21-mj-02951 -DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of April 23, 2020 in the county of Los Angeles in the Central District of California, the

defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Dominick Canty*
_____
*Complainant's signature*

Dominick Canty, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:       6/21/21
_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Charles Eick, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Sara Milstein (x8611)

## <u>AFFIDAVIT</u>

I, Dominick Canty, being duly sworn, declare and state as follows:

### I. <u>PURPOSE OF AFFIDAVIT</u>

1.    This affidavit is made in support of a criminal complaint and arrest warrant against Jacquis Celestine ("CELESTINE") for a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm.

2.    This affidavit is also made in support of an application for a warrant to search 1725 North McDivitt Avenue, Compton, California 90221 (the "SUBJECT PREMISES") as described more fully in Attachment A-1, and the person of CELESTINE, as described more fully in Attachment A-2, for evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 922(g) (Felon in Possession of a Firearm) (the "Subject Offense"), as described more fully in Attachment B.  Attachments A-1, A-2, and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

4.   I am a Special Agent with the FBI and have been so employed since September 15, 2019. I am currently assigned to the Violent Crimes Squad and the Long Beach Resident Agency. During my previous training at the FBI Academy, Quantico, Virginia, I received training in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause. In my current role as a Special Agent I am assigned to a Violent Crime squad where I have experience in investigations involving Gang violence, Drug Trafficking, Child Pornography, Extortion and Homicides. I have had formal training in Case Management, Evidence Collection and Source Handling. Prior to being employed by the FBI as a Special Agent, I was employed by the FBI as an Intelligence Analyst for approximately two years where I have had experience performing analysis for investigations involving Drug Trafficking and Transnational Organized Crime.

## III. SUMMARY OF PROBABLE CAUSE

5.   On April 23, 2020, the Los Angeles Sheriff's Department ("LASD") responded to a call for service at the SUBJECT PREMISES.  Upon their arrival, deputies saw CELESTINE clutch his waistband with his right hand and run from officers. Deputies believed this to be consistent with someone carrying a firearm and continued to pursue CELESTINE.  Prior to being detained by deputies, CELESTINE threw the firearm he was carrying in his waistband into a yard.  Deputies found the

2

firearm, which was loaded with ammunition, and CELESTINE admitted the firearm to be his.  After his post-arrest, post-Miranda interview, CELESTINE provided a written statement admitting that he possessed the firearm.

6.   I spoke to a certified interstate nexus firearms examiner who examined pictures of the firearm and ammunition recovered from CELESTINE.  The expert opined that both items were manufactured outside of California and had therefore traveled in and affected interstate commerce.

### IV. STATEMENT OF PROBABLE CAUSE

7.   Based on my review of law enforcement reports and body camera footage, my conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   CELESTINE Possessed a Firearm and Ammunition on April 23, 2020**

8.   On April 23, 2020, LASD Deputies responded to the SUBJECT PREMISES based on a service call for a gang loitering disturbance.  As Deputies arrived, they saw CELESTINE run away as he clutched his waist.  CELESTINE appeared to be supporting a heavy object as he clutched his waist, and in the deputies' training and experience, they believed CELESTINE was clutching a firearm .

9.   One of the deputies caught up with CELESTINE about one block east of the SUBJECT PREMISES as CELESTINE was climbing over a fence.  CELESTINE placed his hands in the air, and the deputy detained CELESTINE, who was no longer armed at that time.

10.   Deputies then retraced CELESTINE's path of travel from the SUBJECT PREMISES to the place where CELESTINE was detained. In doing so, deputies then found a loaded firearm on the ground. The firearm appeared to be clear of debris, suggesting to the deputies that that it had recently been placed there.

11.   LASD deputies issued Miranda warnings to CELESTINE. CELESTINE then admitted he possessed the firearm found on the ground.  The firearm appeared to be in good working order and was loaded with thirteen rounds of ammunition.

12.   CELESTINE also provided a written statement to deputies which stated, "I saw deputies I ran hopped fences I sat the gun down in the yard then deputy detained me & found gun." Based on my review of the LASD incident report and the above statement, I believe CELESTINE possessed the gun and attempted to hide the gun from deputies.

13.   CELESTINE admitted to being a member of the Santana Blocc Compton Crips ("SBCC") and that the SUBJECT PREMISES is used as an SBCC hangout.

**B.    CELESTINE Has Previously Been Convicted of at Least One Felony**

14.   I have reviewed CELESTINE's certified criminal history, which showed that on December 28, 2017, CELESTINE sustained the following felony convictions in case number TA144955-01:

a.    A violation of California Penal Code section 459: First Degree Residential Burglary, for which CELESTINE was sentenced to 4 years' imprisonment; and

b.   A violation of California Penal Code section 29800(a)(1): Possession of a Firearm by a Felon, for which CELESTINE was sentenced to 4 years' imprisonment.

15.  The certified complaint for CELESTINE's violation of California Penal Code section 29800(a)(1) (Possession of a Firearm by a Felon) shows that was informed that his felony conviction prohibited him from possessing a firearm in the future.

16.  The sentencing minutes for both convictions in case number TA144955-01 show that defendant was informed that he was being convicted of felony crimes.

**C.   Interstate Nexus**

17.  On or about June 15, 2021, I spoke to Trevor Twitchell, a certified FBI interstate nexus examiner, and he advised me that the firearm CELESTINE possessed on April 23, 2021 traveled interstate commerce.  Through pictures, and knowledge of the make and model, Twitchell confirmed the firearm was manufactured outside of California.  Because the firearm was found in California, it is Twitchell's opinion that the firearm traveled in and affected interstate commerce.

**D.   Investigation of the SUBJECT PREMISES**

18.  Based on a search of records from the California Department of Motor Vehicles, I learned that CELESTINE reported the SUBJECT PREMISES as his residence.

19.  On June 10, 2021 I spoke to CELESTINE's current parole officer who advised me that parole officers have conducted home visits at the SUBJECT PREMESIS where officers have observed

CELESTINE.  Specifically, parole officers observed CELESTINE at the SUBJECT PREMESIS approximately 18 times since November 27, 2019.  Most recently, parole officers saw CELESTINE at the SUBJECT PREMESIS on May 4, 2021.  Because parole officers believe that CELESTINE possesses and the SUBJECT PREMISES contains firearms, parole officers will not do any additional in-person visits to the SUBJECT PREMISES.

20.  On June 17, 2021, I was present on surveillance around the SUBJECT PREMISES.  While there, I saw a group of 3-4 men I believe to be SBCC gang members congregating on the curtilage of the SUBJECT PREMISES.  Because surveillance could only safely be established while keeping my distance from the SUBJECT PREMISES, I was unable to determine whether or not CELESTINE was among the group of 3-4 SBCC members.

## V.  TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

21.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.  Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices and in the vehicles in and on the curtilage of their residences.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual

who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices on their person and in backpacks or purses in their vicinity.

b.    Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.    Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital

devices, and they often keep those digital devices in their
residences and in their vehicles.

### VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[1]

22.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.  Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been

---

[1] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

23.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data

during a search of the premises for a number of reasons,
including the following:

    a.   Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

    b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

    24.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

    a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a

user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress CELESTINE's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of CELESTINE's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

25.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. REQUEST FOR NO-KNOCK ENTRY

26.  Based on the evidence described above, I believe that knocking and announcing entry would be dangerous to the law enforcement personnel serving the warrant, given that the

SUBJECT PREMISES is an SBCC gang hangout location and that there might be numerous potentially armed.  Knocking and announcing would also allow for the quick destruction of evidence, namely firearms and ammunition.  I also know, based on my training and experience, including my participation in several search warrants, that critical evidence has been destroyed by subjects while knock-and-announces have been conducted.

27.  I believe CELESTINE is a gang member who possesses and carries firearms, and that he and other SBCC members use the firearms to further the illegal activities of SBCC, and the SBCC gang has been linked to assault, intimidation, robbery, attempted murder, and murder in the area of the SUBJECT PREMISES.  There are several residences in the immediate area that are supporters of SBCC per intelligence obtained during this investigation.  Additionally, subjects who are known to carry firearms (including CELESTINE) have come and gone from the location.

### VIII.   REQUEST FOR NIGHTTIME SERVICE

28.  I request that the Court authorize investigators to serve these warrants during the nighttime, as set forth under Fed. R. Crim. Proc. 41(e)(2)(A)(ii).  Good cause for nighttime service exists because of the heightened risk of violence from those in possession of firearms.  The ability to serve the requested warrants at night will provide law enforcement with a better opportunity to enter the properties without incident to ensure everyone's safety.  Given these facts, I believe that nighttime service is warranted in this case.

## IX. <u>CONCLUSION</u>

29.  For all of the reasons described above, there is probable cause to believe that CELESTINE has committed a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the premises described in Attachment A-1 and the person described in Attachment A-2.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 on this
 21st day of   June   , 2021.

_____
THE HONORABLE CHARLES EICK
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A-1**

PREMISES TO BE SEARCHED

    The premises to be searched is located on the parcel at 1725 North McDivitt Avenue, Compton, California 90221 (the "SUBJECT PREMISES").  The SUBJECT PREMISES (as depicted in the photograph below) is a single-story residence, with a blue exterior.  On the curb in front of the residence marks "1725."  Additionally, there is a driveway south of the residence and a fence leading to a backyard.  The SUBJECT PREMISES includes any attached or detached garage or storage areas located on the parcel, as well as any vehicles in any garages, driveways, or curtilage areas on the parcel.



## <u>ATTACHMENT A-2</u>

<u>PERSON TO BE SEARCHED</u>

The person of JACQUIS CELESTINE ("CELESTINE"), date of birth 10/04/1997, with California Driver's License Number Y3559035.  CELESTINE's California Department of Motor Vehicles records lists him as standing six feet tall, 190 pounds in weight, with black hair and brown eyes.

The search of CELESTINE shall include any and all clothing and personal belongings, digital devices, backpacks, wallets, briefcases, purses, folders, and bags that are within CELESTINE's immediate vicinity and control at the location where the search is executed.  The search shall not include a strip search or a body cavity search.

**ATTACHMENT B**

I.  **ITEMS TO BE SEIZED**

1.  The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 922(g) (Felon in Possession of a Firearm) (the "Subject Offense"), namely:

a.  Firearms or ammunition;

b.  Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

c.  Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violation;

d.  Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violation;

e.  Records, documents, programs, applications, materials, or conversations relating to the sale or purchase of

guns or ammunition, including correspondence, receipts, records, and documents noting prices or times when guns or ammunition were bought, sold, or otherwise distributed;

f.    Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of guns or ammunition;

g.    Contents of any calendar or date book;

h.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

a.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

b.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v. evidence of the times the device was used;

vi. passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii. records of or information about Internet Protocol addresses used by the device;

ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units;

desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  SEARCH PROCEDURE FOR DIGITAL DEVICE(S)

4.   In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.    The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.    The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the

custody and control of attorneys for the government and their support staff for their independent review.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress CELESTINE's thumb- and/or fingers onto the fingerprint sensor of the digital device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of CELESTINE's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.